Aldrich, J.,
dissenting., I proceed to give my reasons for dissenting from the opinion of the majority of the Court.
Since the delivery of my opinion in the case made against Mr. Carew, in Charleston, subsequent investigation and reflection, and the able and searching argument to which the question has been subjected, have convinced me of the correctness of my original conclusion, that the remedy is no part of the contract. I do not understand the majority as adopting this broad doctrine, which, nevertheless, is the doctrine of the cases upon which they rety for the support of their decision ; but that, in some way, the remedy mysteriously,'imperceptibly, or logically, infuses itself into the obligation, and thus any interference with the remedy impairs the obligation. How this is done has not been satisfactorily explained to my mind, and I therefore desire to give additional reasons in support of my first judgment.
The difficulty which I encountered on the threshold was how does the remedy, which the law provides to enforce the obligation, impair that obligation, which is the creation of th& parties *525 to the contract ? I could not see it then; I cannot see it now ; reflection, reading, and argument, all combined, fail to conduct my mind to that conclusion. I understand how the remedy is an incident to the contract; but, how a law, which simply affects that remedy by preventing service for the present, and which does not touch the contract at all, impairs the obligation, I do not understand.
The State is the sovereign; under the Constitution, the Legislature controls the Court as well as the suitor. — it is the supreme authority, and, although it may “not impair the obligation of contracts,” becáuse the Constitution forbids that, yet, it may regulate the time, the mode and the manner of enforcing contracts. Thus, it may prescribe imprisonment for debt; it may abolish imprisonment for debt; it may prescribe imparlance in suits; it may dispense with imparlance in suits; it may establish separate Courts of law and equity; it may combine the two jurisdictions; it may regulate the time and order of the sittings of the Courts on the different circuits; it may change them at will. All these, in a greater or lesser degree, interfere with the remedy, but I do not see that they impair the obligation. Take an example: as the Southern Circuit is now arranged, Edgefield is the first Court on the circuit, and Orangeburg is the last; there is an interval of six weeks between the meeting of the Edgefield Court and the meeting of the Orangeburg Court. A, a merchant, doing business in Edgefield and Orangeburg, contracts a debt of one thousand dollars, for dry goods, with B, a merchant of Charleston, and orders the goods to be sent to Edgefield; and, on the same day, he contracts another debt of one thousand dollars, for groceries, with C, also a merchant of Charleston, which he orders to be sent to Orangeburg. He makes two “notes for these purchases, on the same day, in October, for the same amount, and payable at nine months. The notes are not paid at maturity, and suit is commenced. In December, after the commencement of the suit, and before judgment, the Legislature changes the arrangement of the circuit, and, instead of Orange-burg being the last Court, it is made the first, and Edgefield the last. Before the expiration of the nine months, A becomes *526 embarrassed; if he be pressed, he cannot pay both B and 0, but he can pay either, and he who shall obtain the first judgment will recover his debt. When these debts were made, and when the suits were commenced, all the parties — debtor and creditors — knew, or were supposed to know, the arrangement of the circuits, and the time when the remedy for the enforcement of the contracts could be used. It -was the existing law of the land; but by the change in the law, as regards the circuit, B, who had six weeks the advantage of 0, is postponed, and loses his debt. Does any one maintain that such a change in the times of the sittings of the Courts impairs the obligation of these contracts ? Does any one maintain that such a change in the law would be unconstitutional ? It has been done again and again, without question. And yet if the remedy be a part of, or, in some way, controls the contract, B would have recovered judgment six weeks before C, and saved his debt; whereas by the change he has lost his debt entirely. It may be said, both creditors could have sued to the same Court, in Orangeburg; true, but neither may have suspected the true condition of A ; each may have supposed that he lived in the district to which the goods were sent, and both may have concluded that all that was necessary to secure their respective debts -was to obtain judgment. This example is only used as an illustration. It maybe replied, the creditor has not lost his remedy by the change in the circuit, because he can still sue. And so it may be replied, he has not lost his remedy here, because the Act is limited to the year, and, at the expiration of that time, he may sue. So it may be said of any law which changes the practice of the Courts, or the law of the land, that it impairs the obligation because it interferes with the remedy. Imprisonment for debt was the law of the land, yet that law has been repealed, thus depriving the creditor of a remedy which he had at the making of the contract. I have never heard the constitutionality of that law questioned, although it interferes quite as much with the remedy of the creditor as does this law which simply postpones the collection of his debt. On the contrary, the Courts have maintained its constitutionality. Nor will it do to *527 say, these are general laws affecting the arrangement of the circuits and the practice of the Courts, which must ne'cessarily be under the control of the Legislature. The example given above, of the Southern Circuit, only affects that circuit in which A, B, and C, happen to live. And be it always remembered, that we are. not considering a particular case, but a great principle ; and if the Legislature may not pass a law affecting the remedy in one case, because it impairs the obligation, then, in all cases coming within the reason of the rule, must the argument lead to the same conclusion, or the reasoning is false and mischievous.
The confusion arises from confounding the postponement of the remedy with the preventing of all remedy. It is said the Governor of Georgia, a distinguished lawyer, has vetoed a bill of this character passed by the Georgia Legislature, because he considers it unconstitutional. I have seen his message vetoing the bill. Among other objections, he argues, that the Legislature may continue to postpone the collection of debts from year to year, until the end will be repudiation. This is not argument, it is not reason, it is mere assertion. It is a very violent presumption to suppose that a Legislature, which in a time of universal calamity, to afford temporary relief, passes a law for the general good, which is limited in its duration, will continue the law after the exigency has passed away. It is not to be conceived that a body of wise and patriotic men will so deliberately abuse their office and destroy the character of their State. Nor can it be presumed that any people will tamely submit to have the very foundation-stone of society broken up. The sacred and binding obligation of contracts is a principle implanted in the hearts of the American people; it is announced in the Constitution of the United States; it is announced in all the State Constitutions ; and however individuals may seek to avoid their obligations, the public heart beats true to the sentiment, and the law will express the public will. So long as the necessity exists for preventing the sacrifice of property, and for staying the collection of debts, it is fair to presume, the Legislature in its wisdom, and with a due regard to the general welfare, *528 will interfere to prevent wide-spread ruin and distress, but no longer.
Again, in this forcible and ingenious argument in support of his position, the Governor contends that the clause in the Constitution, as to impairing the obligation of contracts, means the legal obligation, which he argues is the power to enforce by the aid of the Court. But this is the same error, expressed in different language, to wit: confounding the remedy, which is the act of the Legislature, with the obligation, which is the act of the parties to the contract. Before the judicial power was furnished by society, the obligation to perform the contract was the same as it was after the establishment of the Courts. Society only changed the mode of enforcing it. In a state of nature, men were impelled to a performance of their engagements by a sense of moral obligation — conscience—and by brute force. In a state of society, it was found, that it would be intolerable to permit each man to be the judge in his own case, and to use his strength to enforce the performance, so the Courts were instituted in the place of brute force; but this change of the remedy to enforce did not add to, or detract from, the obligation to perform. It is no part of the contract; it does not infuse itself into it so as to control it; it is simply another mode of enforcing performance, which restrains the strong and prevents oppression, which sustains the weak and prevents imposition.
The argument is: “ the obligation of contracts,” which the Legislature is forbidden to impair by law, means their legal obligation, since no human Legislature could impair their moral obligation. But the legal obligation of contracts consists in their being enforceable by legal process, and, therefore, a law which should altogether take away the legal remedies for the enforcement of contracts would destroy their legal obligation. If, then, the legal obligation of contracts be extinguished by wholly abolishing the remedies for their enforcement, the temporary suspension or withholding of those remedies must necessarily “ impair the legal obligation of contracts.” This seems to be the favorite argument; it is the one used by the honorable Senators, who asked leave to enter on the journal of the Senate *529 their reasons for voting against the bill of 1861; it is reproduced and enlarged upon at the bar. I do not know who is entitled to the credit of it, but, in nay humble judgment, it is more S2iecious than solid. The difference is between “ remedy ” and “ obligation.” Do these words have the same meaning, convey the same idea ? It seems to me to be straining the language very hard to say that they do. The great, the good, and the wise men, who framed the Constitution, knew exactly what they wished to ex2oress; every clause in the Constitution proves that. Among them were experienced statesmen, learned philosophers, distinguished lawyers, and ripe scholars ; no set of men on the continent, either before or since, better understood the use of language and the pow'er of words. Now if this be true, would they have used “ obligation ” in the sense of “ remedy ?” Would so important a provision have been left open to misconstruction, when they were framing a clause to meet an existing evil ? Would they not have used the word “ enforcement ” instead of “ obligation,” if they meant the remedy ? It ap2rears to me so plain and conclusive that language is not strong enough to make it more so. What was the evil to be cured ? The States, in consequence of the great distress which so generally prevailed after the war, and the great scarceness of coin, had resorted to various legislative expedients to relieve their citizens. They had emitted bills of credit, they had passed what were called “ Pine Barren Acts,” all for the purpose of relieving the debtor class, of enabling them to meet their contracts with something which they had, else than money, which they did not have, and this paper, this land, was to be received in payment of debts; it was, in effect, a legal tender. To obviate this evil, the Convention-which framed the Constitution made nothing but gold and silver a legal tender, and ordained that the obligation of contracts should not be impaired by making satisfaction in paper or pine barren land, when the obligation was to pay money. Now, when they used the word “ obligation,” if they had intended it in the sense of “remedy,” Washington, Rufus King, Alexander Hamilton, Livingston, Franklin, Governeur Morris, Madison, John Rutledge, and the Pinckneys would have' said so; *530 they were too well acquainted with the English language to have used the word in that sense, and too highly impressed with the importance of the subject to have left it to construction; and to say that they did so use it, and did so leave it, is too great a tax upon the understanding. But to prove that these scholars carefully selected, with precision, with scholar-like accuracy, the very words to convey the exact idea, so as to avoid confusion or misconstruction, it is only necessary to refer to the Constitution adopted by the Provisional Congress, at Montgomery, where, after more than eighty years’ experience of the Constitution framed by these men and their compeers, the men who composed that body found it necessary only to change a word, here and there, in the old Constitution, to make more clear that which was, perhaps, sufficiently clear before. If, after this, it be insisted that in the use of the words “impairing the obligation of contracts,” is meant the legal remedy afforded by the Courts, then there is no defining the limit to which judicial construction may extend. The Legislature of Georgia, I am informed, passed the law by the constitutional majority over the Governor’s veto. It does not detract from him to say that the collective wisdom of that body is higher authority than his individual opinion.
Let us pursue this head a little further. Why is it insisted that “the obligation of contracts” means the legal remedy? Simply for the purposes of the argument; without that construction the argument halts, it cannot start. There is nothing in the cotemporaneous history to prove that such was the meaning of the framers of that clause in the Constitution. If so, Chief Justice Marshall would have known it, and surely the natural and critical signification of the words do not convey this idea. It has been so often repeated, and is so pertinaciously,insisted upon, that the mind has become fatigued in combating the assertion. The natural signification of these words is that duty which the contract imposes upon the parties thereto, not those means which the law provides for its enforcement. Men equally conscientious, being parties to a contract, have differed sincerely as to the construction, and will continue so to differ; such is the constitution of the human mind. In all such cases, it is abso *531 lutcly necessary to seek the aid of the Courts for authoritative settlement. When that authority pronounces its decision, the matter is ended, and the parties to the contract immediately acquiesce; they being- equally conscientious, there is no necessity for the enforcing power of the Courts. If either party to the contract refuses to yield Ms assent to the decision so announced, then the party so refusing may be compelled to the performance by the executive power of the Court, which follows the judgment, but is by no means a part of the obligation, or necessary to its construction, or its controlling influence. Suppose the Legislature to pass a law, that all contracts of a certain character shall be construed in a uniform way, without regard to the general signification of the words used in framing the contract ? Such a law would come directly within the meaning of the clause, because the construction of every contract must depend upon the words used to convey the idea of the contracting parties, and the rules which the Courts have established for the construction, and- therefore an arbitrary rule of construction would impair the obligation; because it cannot be said that the obligation is not impaired when men contract for money, and the law insists that they shall be satisfied with paper or land. It is that sort of legislation which is provided against, not that legislation which, while it maintains the obligation of the contract in its integrity, for the general welfare withholds for a time the enforcement of the remedy. The legal construction is the obligation; the enforcement of that construction is the remedy. The supreme power may not impair the former; it may control the latter. “Impair the obligation of contracts.-” what does that mean ? The contract is the agreement; the obligation is the thing to be done or not to be done; the impairing is the “ weakening in quantity or quality.” Now I ask, how does the idea of remedy come in here, except by interpolating the word legal ? It is not in the clause, and it is not conveyed by the original signification of the words. The remedy is the means, provided by the lex fori, to enforce when the Courts have given construction. If the Legislature, from policy, with a due regard to the general welfare of the people, shall say, *532 this remedy, this means to enforce, shall be withheld for a given time, it does not weaken the obligation either in quantity or quality, for that remains exactly the same as it was before the law. But when the law declares that all contracts of a certain character must be construed in a particular way, without regard to the meaning of the words, or the intention of the parties, or the construction of the Courts, then it is the duty of the Courts to hold that such a laiv is in violation of the Constitution, and is, therefore, void. The whole difficulty arises from the interpolation of the words “legal” and “moral,” before the word obligation; the framers of the Constitution deliberately adopted the clause as it now stands ; but ingenious men, in their anxiety to give a construction which would contract the power of the legislative department, have interpolated this word “ legal ” before the word " obligation,” for the purposes of the argument. If Ave take the clause as it came from the hands 'of its framers, and interpret it fairly, naturally, to arrive at the simple truth, and to determine the exact meaning of the words, I do not see how the mind can arrive at the conclusion that the law we are iioav considering is a violation of the Constitution. Look at the difficulty we are now in, suppose it be held that the law is constitutional as to contracts entered into after the passage of the law. I trust we may be able to reconcile all seeming contradiction, but I fear the logical conclusions will not be very apparent to the popular mind. If it be insisted, however, that the clause can only be correctly interpreted, bj^ interpolating the word “legal” before “obligation,” is there no other meaning to be attached to that phrase, than the suit, or the remedy provided by law — than Avhat is called the “ actionability” of the contract ? It onty goes to prove, that when the mind departs from the true and real meaning of a sentence or form of words, it is obliged to grope all around, inventing nevr meanings for accepted phrases, as well as coining new Avoids.
Whence arises this clamor ? In the first 3rears of the war, man3r of our merchants, under a patriotic impulse, or perhaps because Confederate money Avas cheap, complied promptly with the Act of the Confederate Congress, entitled “An Act for the *533 sequestration of the estates, property and effects of alien enemies and for the indemnity of citizens of the Confederate States, and persons aiding the same in the existing war with the United States ;” and, under the provisions of this Act, paid over to the Receivers the debts due by them to their Northern creditors. Since our defeat and failure, these debts have to be paid to the original creditors, and these debtors desire to collect their home debts (which heretofore they have considered a very good investment) in order to restore their credit in the North and to resume business ; hence the clamor against the constitutionality of this law. These very men, although they paid their debts due to the North to the Receiver in Confederate money, could not, many of them, be persuaded to receive, in the same circulating medium, the debts due to themselves by their home debtors. All this class of peoj>le are loud against the constitutionality of the law; hut their consciences were not disturbed about the constitutionality of the Act of the Confederate Congress which enabled them to pay in Confederate money to the Confederate Receiver the debts due by them to their Northern creditors, although, under the law of the State and of the .Confederate States, the only legal tender was gold and silver. Now, without intending to impeach either the wisdom, or the justice, or the constitutionality, of the Act of the Confederate Congress, I may be permitted to say that I know conscientious and patriotic men who thought it was a duty which they owed to their Northern creditors, who had trusted them in good faith, and had extended a credit which enabled them to carry on a prosperous business, to pay the debts thus honestly incurred before the law went into operation. Why did Congress pass this law ? As a war measure and to relieve the people. If the revolution had been successful, it would have been a great relief. But we have failed, and, as we have no power, tiie debts must be paid again, and in a currency much more difficult to he obtained. Not so, however, in the State. Why did the Legislature pass the law we are now considering ? As a war measure and to relieve the people. It is true, we have failed; but the State has still the control of the subject-matter, and because the necessity to relieve *534 the people is now greater even than it was when the Act was first passed, it is re-enacted, and because the Legislature has the power, and it is its duty to provide for the general welfare and happiness of the people, and in a time of such general distress and wide-spread ruin to prevent the sacrifice of prop'erty. Again, very many of those who now clamor have been able to make advantageous compromises with their Northern creditors, and I have but little doubt, if they will offer the same terms to their Southern debtors, it will be found that this law is no obstacle in the way of a settlement. It is very well now to Speculate upon the impolicy of the law, and to argue that, but for its passage, the indebtedness of the country would have been greatly decreased. But those who thus argue seem to forget the wild spirit of speculation which prevailed during the war, inducing those who were not in the service, as well as many who were, to engage in the most reckless enterprises. But for this law, as our affairs began to darken, when the wives and children of many of our brave men were being supported by State charity, when corn and all the other necessaries of life were at fabulous prices, instead of forbearing to press their demands, these speculators would have realized their debts, not in Confederate money, but in the land of the absent soldier, whose pay in the field afforded him no surplus for the payment of debts, and whose service in the front afforded him no opportunity to engage in successful speculation ; and be it always remembered that the legal tender in South Carolina is gold and silver coin, and not Confederate or Treasury notes.
Before society was organized, there were no Courts in which to enforce contracts, and yet men engaged in barter, relying upon the moral obligation and their ability to compel a performance. The savage who had corn and wanted skins exchanged his corn to the savage who had skins and wanted corn. Let us suppose that the savage who stood in need of the corn failed to deliver the skins which he had promised to pay for the corn. What was the remedy ? Why, the savage who let him have the corn' took him by the throat and beat him, or went into his wigwam and seized his implements of the chase, his blankets,' *535 his trinkets, or any other property that he could find, in satisfaction of his debts, if he was strong enough; if he was not strong enough, he was remediless. Let us suppose, further, that just at the point of time when this primitive mode of enforcing performance is about to be put in practice, the chief should interfere, and say, “Hold your hand; you'must not beat him now, because you will disable him, and he cannot hunt and get the skins to pay yon for your corn; or you must not take his hunting implements and blankets, because that will deprive him of the means which he has to obtain the skins with which to pay you for your corn. If, horvever, he does not hunt and get the skins that he has promised you within a given time, you may beat him and take his property.” Will any one say that this withholding of the natural right to enforce performance, or to obtain satisfaction for the failure to meet the engagement, impairs the obligation? Is not the obligation as strong and binding after the interposition of the chief as it was before? The savage who exchanged the corn was under no obligation to beat; if his neighbor failed to deliver him the stipulated number of skins he had the natural right to beat or to seize property, if he was strong enough, but he was under no obligation to do so. And so with the savage who was to deliver the skins. He was under a moral obligation to deliver skins; but it did not follow that, if he failed, he must be beaten. He ran that risk; that was an incident to the contract, but was no part of it. So with us; the State, the sovereign, says, You have suffered a common calamity ; debtors and creditors have alike been injured. If the creditor be permitted now to enforce his remedy, it cuts off the debtor from all chance of retrieving his broken fortunes. Every thing has been swept away but his land; it is all that remains to him. To sell that and divide it among his creditors will help no one; it will be a mere pittance to them and utter ruin to him, cutting off the last and only chance to recuperate. At this point, the State, the sovereign, comes in, and wisely, beneficently, constitutionally says, “Stay; hold your hand; give your debtor, who has been equally unfortunate with yourself, a chance to recover; and if, within a given time, he does *536 not begin to.pay, then you may enforce jrour remedy.” Is the obligation less binding now than it was before the war, or before the passing of the Act ? Is not the debtor still morally and legally bound by his contract ? Does the changing of the time when to sue impair the obligation to pay or perform 1 I cannot see it.
The means of enforcing the performance of a contract by suit is the lex fori, which is always regulated by the Legislature, and which may be changed, altered, amended, or suspended, as in the wisdom of the sovereign power will best promote the public good. Because the Legislature, being the sovereign of both parties to the contract, it is not only'' its right, but it is its duty, to see that the public good is secured and the public happiness promoted. This is all that the Legislature has done now; it has not interfered with the obligation of the contract, which is ’the lex contractus; that remains unimpaired. It has simply suspended, for a given time, the application of the remedy, which is the lex fori. To contend that the Legislature, the sovereign, cannot pass laws to promote the general welfare and to secure the general good of the governed, is to deprive it of its highest and most essential prerogative. And in all such cases they alone must be the judges, and must necessarily be so, because they alone.represent the people, the source of all power. In 1824 the Court considered a case which, in my opinion, goes far to settle this question. It is the case of Lowden vs. Moses, 1 McC. 93. By the Act of 1815, a vendue master was deprived of the benefit of the Act for the relief of insolvents “ in all eases where his or their debt or debts arose from not paying to the owner or owners who shall place property in their hands for sale the proceeds of the property so disposed of.” Moses sold property placed in his hands by Lowden for seventeen thousand dollars, and failed. Lowden sued him, and in June, 1821, obtained his judgment. Moses was put in jail, and was there in December, 1823. At the session of the Legislature of 1823 the Act of 1815 was repealed, and in a few days after the ratification of the repealing Act Moses applied for the benefit of the Insolvent Debtors’ Act. It was objected to his discharge, *537 among other grounds, that an essential part of Lowden’s remedy, when the debt was contracted, was, that if Moses failed to pay, he could not have the benefit of the Insolvent Debtors’ Act, and that the Act of 1823 was not retrospective. The case appears to have been fully and ably argued on both sides; Messrs. Prioleau and Holmes sustaining the application, and Messrs. Gadsden and King opposing the discharge. Judge Bay, who heard the case on circuit, said: “ I do admit that when a man contracts a debt, he contracts eo instanti, or comes under an obligation to pay it or make satisfaction for it, and that this obligation remains until such satisfaction is made. And this is the sum and substance of every such contract; indeed, it is literally the lex contractus, both by the civil and common law. After this contract is made and entered into, then it is to be governed and regulated by the lex fori, or the general laws of the land; ' one of which is, that if the debtor does not pay and satisfy the debt, the creditor has the right to sue and imprison him.” He concludes his reasoning on this point by saying: “It cannot be denied that our Legislature, by the Act of 1815, did suspend the operation of this humane and benevolent Act against vendue masters, for reasons which, no doubt, they thought sufficient to justify them in such suspension. But, in the year 1823, they thought proper to remove that suspension, for reasons which induced them, no doubt, to conclude that the suspension of the insolvent Acts to that class of men was unreasonable and unjust. But this was no interference with the obligation of any contract any vendue master may have entered into. It left all those contracts in the same state where the Act of 1815 found them ; and this is an inherent act of sovereign power which every State has a right to exercise as it thinks proper. Chief Justice Marshall (4 Wheat. 200) says: ‘The distinction between the obligation of a contract and the remedy given by the Legislature to enforce the obligation of it, is founded in the nature of things; without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the State shall direct. Confinement of the debtor may be a punishment for not performing his contract, or may be allowed as a means *538 of inducing Mm to perform it. But the State' may refuse to inflict this punishment, or withhold this means and leave the contract in full force. Imprisonment is no part of the contract, and simply to release the prisoner does not impair its obligation.’ ” The prisoner was discharged, and on the appeal the Court did not hear the counsel for the defendant, but agreed with the Court below. Now, if the remedy be a part of the contract, or, in some way, controls the obligation, a great injustice was done to this man Lowden, and Moses ought to have been kept in jail until he paid him his seventeen thousand dollars. But it was no part of the contract; it in no way affected the obligation; like the right to sue, it was the general law of the land, which is subject to such restraint, conditions, modifications, alterations, and suspensions as the lex fori, in the wisdom of the Legislature, shall, from time to time, ordain and establish. Let us examine another case, in our own books, in which that eminent man, Judge Cheves, (a fit name to be mentioned in connection with that great light, Chief Justice Marshall,) expresses an opinion which, in my judgment, entirely sustains the view I am now presenting. In Alexander vs. Gibson, 1 N. & McC. 492, he says: “A foreign creditor who sues in this State, to whose suit the Statute of Limitations of this State is pleaded, will in vain say that the debt was contracted in another State or country by whose laws it was not barred. It would be answered, the statute belongs, not to the law of the contract, but is part of the lex fori, and must, therefore prevail. * * * Thus, the lex fori will extinguish the contract itself without any pecuniary or other valuable satisfaction.” At page 493, he continues: “Is the discharge of the debtor from his obligations to creditors, who have not arrested his person, but who have sued in the tribunal which administers the benefit of the insolvent Act, within the principle of the lex foril I think, from the examples which we have discussed, we are prepared to say the remedy, if not the debt, may be extinguished by this law, not only in the particular tribunal, but in every other tribunal, and in every other country.” And this Act also provides that no creditor, who is such at the date of the application, shall *539 implead the debtor, so as to charge his person, in less than twelve months from the time of his release under the Act; which is, to all intents and purposes, the law now under discussion. It is said, however, all this reasoning applies to the insolvent laws. Certainly; but it also applies to the very principle we are now considering. If the Legislature can control the remedy, can alter it, can extend it, can abridge it, in one instance, what hinders that it may not do it in another ? Mr. Chitty, in his work on Contracts, *p. 628, says: “ At common law, the lapse of time cannot be offered as a bar to the remedy; the limitation is entirely prescribed by statute. But, even at common law, great delay in instituting proceedings may, unless explained, furnish the jury with a ground for presuming that the claim has been satisfied. The Statute of Limitations does not discharge or extinguish the debt — it only bars the remedy by action ; so that a lien in respect of the debt is not destroyed, though the remedy by suit to recover the debt begone.” And yet, it is supposed that an Act preventing the service of mesne or final process by the Sheriff, for one year, is unconstitutional, because it impairs the obligation of contracts. All the reasoning and authority go to prove that the remedy is. no part of the lex contractus, but is simply a creation of the lex fori, and, therefore, a change of the remedy does not impair the obligation of the contract. The lex fori is a matter of legislative regulation; the lex contractus is a matter of judicial construction. The one is regulated by the enactments of the Legislature; the other is governed by the decisions of the Courts.
If it be assumed that the remedy is a part of the contract, or-if, in order to avoid this broad doctrine, it be contended that the remedy, in some way not explained, influences and controls, the obligation, then it is not difficult to maintain that any alteration thereof “impairs the obligation.” But this is the very thing to be shown; and, when it is shown, it will be very difficult to maintain our insolvent and limitation Acts. It must be proved that the remedy is a part of the contract, before it can be contended that an alteration or suspension thereof im *540 pairs the obligation. I have been looking for that proof; I have been listening to hear it; but I have neither read it in the books, nor heard it at the bar or in council. Where is it? Eminent men have asserted that it is; men equally eminent have asserted that it is not. It is simply the assertion of opinion, either way, and the onus is on those who assert that it is. I have looked in vain for the proof; I have looked in vain for the reason of the assertion. If I be told that Chancellor Kent and Mr. Justice Story say that it is, and that they are high authority, I reply, that Mr. Chief Justice Marshall, a cotemporary and associate of the men who framed the Constitution, and Judge Cheves, one of the wisest and greatest men that this State has ever produced, say that it is not, and that they are higher authority. If I be told that the majority of juridical writers say that it is, while I do not admit the assertion, I may reply, that the most eminent and the most learned say that it is not. But I do not admit that the majorityof writers say that it is. Nor am T convinced that Chancellor Kent and Mr. Justice Story maintain any such latitudinarian construction. They speak of the destruction of the remedy as a violation of the Constitution, but I do not understand them as objecting to any modification of, or change in, the remedy. I rather conclude they admit that the remedy is under the control of the legislative authority, and may be changed, modified, or suspended, so that it be not entirely destroyed. And those who cite these writers as authority for the position that any change in the remedy impairs the obligation of the contract, must show that they regard the suspension of the remedy as equivalent to its extinguishment I find Chancellor Kent using this language: “If a party be discharged from imprisonment only, he remains liable to arrest for the same debt in another State; for imprisonment relates only to the remedy, which forms no part of the contract.” 2 Kent, 611, marg. p. 462, ch. 39, 9 Am. ed. And in note A, on same page, he cites a number of authorities to sustain him in the position, Mr. Justice Story being one of them. But even if they do so maintain, I repeat I am not disposed to yield my judgment on a disputed point of constitu *541 tional law to these authorities when I find such men as Marshall and Cheves differing from them. I concede much to their industry and to their learning, but on a question of'constitutional construction I have never considered them as the highest authority; certainly not to compai-e with such minds as Marshall and Cheves; nor am I singular in this opinion. We are considering this question for ourselves, for our State, and for our people. Let us be governed by reason and argument, not by numbers and assertion. The restriction in the Constitution is against the passing of “ a law impairing the obligation of contracts.” How can a law, which merely hastens or retards the remedy, impair the obligation? This question constantly recurs. My mind may be so constituted as not to be able to arrive at a correct conclusion on this subject, but certainly I am not able to come to that conclusion. The obligation is to do or not to do. The means of enforcing the performance, the remedy, is something very different from the obligation itself. It is entirely outside of the contract, it is a creation of society, it is a part of that machinery which society has erected for its government, and which we call the “judicial power.” But that it forms a part of the obligation of every contract which is entered into by the individuals composing society, I cannot understand. What does the word “impair” mean? It means “to make worse, to diminish in quantity, value or excellence, to weaken, to enfeeble.” (Webster.) “To make or become worse or less, to lessen, reduce, or diminish the quantity or quality.” (Richardson.) I ask, then, in what essential is the obligation impaired by a suspension of the remedy ? Is it lessened, reduced, or diminished in quantity or quality? The obligation to do or not to do is the same. The privilege to enforce or not to enforce by the aid of the Courts is the same. The time when the contract may be enforced by the aid of the Courts has been changed, or I should rather say put off. Is time in bringing the suit an essential element of the remedy ? Ho man is compelled to sue; it is a privilege conferred by law.
Before society was organized,’ there was no remedy but brute force. There was simply the moral obligation to perform that *542 which the party had promised to perform. Society has provided the remedy: it has adopted a Constitution, in which certain fundamental principles are announced for the government of the body politic; it has organized a Legislature, to which it has given the power to establish Courts and to prescribe rules for the administration of justice, and which also has the power to make the laws by which all the transactions between the individuals composing the State are to be regulated. If these laws do not violate the fundamental principles announced in the Constitution, they are supreme. The law which governs the contract is the lex contractus. The law which enables the citizen to enforce the performance of the contract is the lex fori. But they are as distinct and separate as day and night. I cannot see, therefore, how the supreme power in the State, (supreme in reference to the subject-matter,) which has the right to regulate the administration of justice, to organize the Courts, to arrange the circuits, to say when the Courts shall be holden and when thejr shall not be holden, and to enact such laws as will best promote the welfare, the interest and(the happiness of the whole people, and best protect their rights of person and property, impairs the obligation of contracts by the passage of this law, “ to extend relief to debtors, and to prevent the sacrifice of property at public sales,” which forbids “any officer of this State to serve or execute any mesne or final process of any of the Courts of this State for the collection of money,” for a time therein limited, except in certain cases therein provided. It pretends to no construction; in anticipation of a war, it forbids the officers of the State to serve mesne or final process until the adjournment of the next Legislature, and that is all. The anticipation is realized ; a war, the most gigantic in history, which taxes the utmost powers and resources of the whole country in its length and breadth, ensues, and the law is continued for another year, and so on from year to year, until failure and defeat is the end, leaving the country prostrate, ruined, and desolated, with its cities, towns, and villages burne-1, its labor destroyed, its plantations and farms devastated, its commerce crippled, its people stripped and suffering ; when the Legislature is allowed to meet again by permission of the conqueror, *543 and in its wisdom, with a full knowlege of the distressed condition of the country, re-enacts the law for another year. Is it for us, a co-ordinate branch of the government, to saj*-, that such a law, so wise, so humane, so eminently proper under the circumstances, is unconstitutional and void ? If it be so, we must say so. But if it be unconstitutional to extend relief to debtors, and to prevent the sacrifice of property, under such circumstances, by what is here ealled the “ Stay Law," then I do not see how we can avoid the conclusion, that every law which has been passed changing the time of holding the courts, altering the arrangement of .the circuits, modifying the provisions in regard to insolvency, prison-bounds and holding to bail, by the same line of reasoning is unconstitutional, for every such law interferes with the remedy in a greater or lesser degree. What does Chief Justice Marshall say, in Ogden vs. Saunders, 12 Wheat. 343: “We have, then, no hesitation in saying, that, however law may act upon contracts; it (Joes not enter into them, and become a part of the agreement. The effect of such a principle would be a mischievous abridgment of legislative power over subjects within the proper'jurisdiction of States, by arresting their power to repeal or modify such laws with respect to existing contracts.” This is all thaít I have contended for. I find no difficulty in receiving this idea; but I do find it impossible to receive as a part of the eontract-.the'femedy which the Legislature has provided for its enforcement. The right to contract is an original right, and so is the right to "enforce. These rights are not derived from society ; they are individual rights which have been brought into society. After society was formed, and constitutions and laws were made, and courts established, the Legislature, representing the sovereign will, framed a system of rules and regulations by which Courts are governed in the construction and enforcing of contracts; but these rules and regulations being at all times liable to change, as the wisdom of the sovereign may direct, or the necessities of society may demand, it follows naturally, and it seems to me inevitably, that the remedy cannot be a part of the contract, or control the obligation. I repeat, can any two things be more distinct than the obligation and the remedy ? The obligation is the thing to be done or not *544 to be done, and is tlie act of the parties to the contract. The remedy is the mode which society has provided to enforce the performance of the obligation, and is the act of the Legislature. How, then, can it be said that the remedy, which is the creation of society, provided by the sovereign power to enable the governed to enforce performance, is a part of, or controls, the obligation of the contract itself, which is the thing to be enforced, and which is the creation of the parties thereto ? If this law annuls the obligation, destroys the contract, the argument may apply; but, as it does not, in the language of Chief Justice Marshall, “ We perceive, then, no reason for the opinion, that the prohibition ‘to pass any law impairing the obligation of contracts’ is incompatible with the free exercise of that discretion which the State Legislatures possess, in common with all governments, to regulate the remedies afforded by their own Courts. We think •that obligation and remedy are distinguishable from each other— that the first is created by the act of the parties, the last irf afforded by the government. The words of the restriction we have been considering countenance, wo think, this idea. ‘No State shall pass any law impairing the obligation of contracts.’ ■ These words seem to import that the obligation is intrinsic, that it is created by the contract itself, not that it is dependent on the laws made to enforce it.” 12 Wheat. 353. In none of the cases referred to was the identical question here presented considered; some were as to insolvent acts, some were as to legislative acts, which made new contracts; but in all, it is worthy of remark, there is a great conflict of opinion.
If, however, the question is to be decided by numbers rather than by reason, it seems to me that the weight of authority in favor of the constitutionality of the law greatly preponderates. The Act was first passed in 18G1, it was re-enacted in 1862, 1863, 1864 and 1865, and was sanctioned and approved by the Convention of September, 1865, which met before the Legislature of 1865. If that Convention be recognized as a power in the State that had a right to declare the fundamental law, and it did change the Constitution in fundamental articles, the ordinance of that body, “to declare in force the Constitution and laws heretofore in *545 force,” &c., which includes this Act, and describes it as the law “ usually known as the Stay Law,” would seem to put the question at rest in South Carolina. Seven of the Judges now composing this Court were in that Convention.
It is not necessary now to inquire how far the decision against the constitutionality of this Act will affect contracts not under seal, and whether that portion of the Act which prevents the service of process can be declared unconstitutional and void, and that portion which suspends the operation of the Statute of Limitations be declared in full force and effect.
To conclude, this legislation is not new in South Carolina. In 1182, 4 Stat. 513, the Legislature, “for the want of specie, and because the people have been greatly distressed by the war,” passed an Act in which it was enacted, “that no suit shall be commenced until ten days after the next meeting and sitting of the General Assembly, unless the creditor shall make oath before some magistrate that he has good reason to believe the debtor intends to quit, or send his property out of this State,” &e. In 1183, 6 Stat. 621, this Act was continued in force, because “the reasons and circumstances which induced the enactment of the same do still operate.” And in 1185, 4 Stat. Ill, “in consequence of the failure of crops, and from the exportation of specie, and because many citizens of the State were threatened with total ruin,” a similar Act was passed. It is curious to see how the legislation has repeated itself in this, our day, and if it was proper then, how much more eminently proper is it now ? Therefore, reason, legislation, argument, and authority, all combine to sustain me in the correctness of the opinion pronounced on circuit.
An argument might be here urged that, when this Act was passed, it was not in derogation of the Constitution of the United States, because the State had then seceded from the Union; and when the ordinance of secession was repealed, the Convention, so attempting to bring the State again under the old Constitution, especially declared this Act tobe in force,-and it may be supposed intended to free it from all constitutional objection. If, however, the argument against the constitutionality of the law is *546 conclusive, it maybe that the same line of reasoning which proves that the Legislature may not pass such a law, will be equally potent to convince that the Convention cannot breathe into it vitality. It may be as well, however, to throw out the idea, that when the Convention passed the ordinance continuing this law in force, it was the act of a sovereign and independent State. At that time the State stood out by herself, not bound by the Constitution of the United States, and, therefore, not trammelled by any of its provisions. The Constitution of the Confederate States was a dead letter, because the Confederacy had ceased to exist, it had no government, its armies were broken and scattered, its arms and munitions of war were surrendered, its President a prisoner, and all its officials fugitives or captives, so that the State stood • out alone as a sovereign independent State, or as a captured province. It was not the latter, because, at the invitation of the President of the United States, the Convention was then in session, altering the fundamental law, to suit the changed condition of things, and to reinstate her in her place in the Union. The ordinance affected only her own citizens, and, as an act of sovereign power, was not in derogation of the Constitution of the United States. I am not disposed to extend this opinion, already much longer than I desire, and therefore decline to pursue the discussion.
The near approach to unanimity in the Court of course makes me very distrustful of the correctness of my opinion ; but I cannot see the error in the argument which has convinced my mind, and not being able to agree with the majority, it is due to myself and to the Legislature which passed,the Act to give the reasons for my judgment. I trust the conclusion to which the Court has arrived will be conducive of good to the country, and that the fears and doubts which agitate my mind will prove illusive.

Motions granted.

Note. — Is it not remarkable that Courts -will undertake to decide that a law deliberately enacted by the Legislature of a sovereign State is unconstitutional and void, because it is in derogation of that clause in the Constitution of the United States which forbids a State to pass a “ law impairing the obligation of contracts,” when no Court of final jurisdiction has yet determined what is meant by the *547 obligation of contracts? Mark the expression: it is, the “obligation” (in the singular) of “contracts,” (in the plural.) Now what does that mean? Certainly something that is the same in all of the States. -Whatever it may be, it must be the same in Maine, in South Carolina, in Texas. It is not, and cannot be, something that is doubtful; and, if this case is to be decided by authority, I call for the decision that decides what is the meaning of the phrase. It cannot be the moral obligation, because that existed before the Constitution was adopted, and was obligatory on the parties without its aid. It cannot be the legal obligation, because that was an existing right at the framing of the Constitution, which the Courts could then enforce, and if that was the meaning, it would have been so expressed. What then was it ? Congress, by the first article of the amendments, declared that no law shall be made respecting an establishment of religion, or abridging the freedom of speech, or of the press, or of the right to petition the government, or of the right of the people to keep and bear arms. What rights were these ? They were not rights conferred by law, but they were natural rights which existed independently of law, and with which neither States nor Congress were allowed to interfere. The freedom of speech does not mean slander ; the freedom of the press does not mean libel; the right to petition does not mean the impertinent interference of the people of one State with the domestic regulations of the people of another State ; the right to bear arms does not mean the right to shoot any man who may offend you. Henee, I infer, that the obligation referred to in the clause under consideration is that natural obligation of contracts which existed before the Constitution was adopted and with which the States were forbidden to interfere. That is, that real obligation, the exact meaning of the contract, which the Courts are to determine whenever the parties thereto disagree, and which no State can impair by legislation. It is the something which is the same in each and every of the States. It cannot be the right to sue, because the practice of the Courts is different in different States, and that was a right which each citizen possessed without the aid of the Constitution, and before it was adopted. It must then be “that natural obligation, which contracts have of natural right in conformity to natural justice.” Thus, when A and B enter into a contract which has a plain and natural meaning, the Legislature will not be permitted to place upon the words used to express the contract an artificial meaning, and, if they do, the Courts must declare that every such strained and artificial meaning is unconstitutional and void. How a law, which acts simply upon the remedy, can be forced to come within the meaning of this clause, is what I cannot see.
Let us take the case of Ogden vs. Saunders, which is the leading case, and on the authority of which all the cases cited have gone ; did that case decide what is the “ obligation of contracts ?” It did not. Of the seven Judges composing the Court, there were four different opinions, and of the four Judges who did agree in deciding the case, three different opinions prevailed; and so as to the text writers, the same division of opinion obtains. I therefore repeat, it is remarkable that a Court will undertake to decide that the law is unconstitutional, when it has not yet been decided what is “the obligation of contracts.”
Since writing this opinion, Lysander Spooner, Esq., of Boston, kindly sent me his book, entitled “A New System of Paper Currency,” and to it I am indebted for the point made in this note. — A. P. A.